WORCESTER DISTRICT STEWARDS NEW ENGLAND CONFERENCE OF METHODIST EPISCOPAL CHURCH *vs.* ASSESSORS OF WORCESTER.

Suffolk.  May 6, 1947. — June 25, 1947.

Present: FIELD, C.J., LUMMUS, DOLAN, RONAN, & SPALDING, JJ.

*Taxation,* Real estate tax: exemption, parsonage. *Religious Organization. Words,* "Parsonage."

A house, used as a residence by a superintendent of a district of a religious organization composed of fifty-seven churches, who, although a minister, was not the incumbent of any particular church, and who had extensive supervisory duties over the spiritual and temporal affairs of the churches in his district and over their pastors and persons licensed to preach, was not a "parsonage" within the provisions of G. L. (Ter. Ed.) c. 59, § 5, Eleventh, as amended by St. 1938, c. 317.

APPEAL from a decision by the Appellate Tax Board.

*P. Nichols,* for the taxpayer.

*H. J. Meleski,* Assistant City Solicitor, for the assessors.

DOLAN, J. This is an appeal by the Worcester District Stewards New England Conference of Methodist Episcopal Church, hereinafter referred to as the taxpayers, from a decision of the Appellate Tax Board for the assessors, denying partial abatement of a tax assessed upon certain real estate by the assessors of the city of Worcester. The only issue for determination is whether the real estate in question

was a parsonage within the meaning of G. L. (Ter. Ed.) c. 59, § 5, Eleventh, as amended by St. 1938, c. 317, the provisions of which are set forth in a footnote. [1]

The relevant facts are these: The real estate in question consisted of a parcel of land with a house and small garage thereon. The premises were occupied by the district superintendent of the Worcester District Stewards New England Conference of Methodist Episcopal Church, a religious organization. The district superintendent was appointed as such by the bishop in whose diocese the city of Worcester is located. The territorial jurisdiction of the bishop comprises the greater part of New England. The diocese is divided into conferences, and these in turn are divided into districts. The taxpayers took title to the real estate in question, located at 15 Berwick Street in Worcester, on October 5, 1917, for the use and benefit of the Worcester District Stewards New England Conference of Methodist Episcopal Church. Worcester district was composed of fifty-seven churches located in various sections of the district, including seven churches located in Worcester. Under the provisions of the discipline of the church the district superintendent is almost always an ordained minister. He is appointed to superintend the work of the pastors in a district on a full-time basis. "His duties are substantially as follows: To travel through his district in order to preach and to oversee the spiritual and temporal affairs of the church; in the absence of the bishop, to have charge of all travelling ministers and local preachers in the district and to appoint temporary preachers; to license preachers and preside in the conferences; to see that all charters, deeds, and other conveyances of church property in his district conform to the discipline and to the laws, usages, and forms of the county, State, territory or country within which such

---

[1] "Eleventh, Houses of religious worship owned by, or held in trust for the use of, any religious organization, and the pews and furniture, and, to an amount not exceeding five thousand dollars for each parsonage, parsonages so owned or held; but such exemption shall not, except as herein provided, extend to any portion of any such house of religious worship appropriated for purposes other than religious worship or instruction." The history of this statute is stated in *Assessors of Boston* v. *Old South Society in Boston*, 314 Mass. 364, 365–366. It need not be recited here.

property is situated; to confer and advise with pastors in the district; to report the names and addresses of all local preachers in his district to the secretary of the annual conference; and to report the names and addresses of all who have been licensed to preach during the year and all candidates for the ministry to the commission on courses of study; to prepare and deliver to his successor an official list of all abandoned church buildings, parsonages, cemeteries, and other such property within the bounds of his district, and also a list of all endowments, annuities, trust funds, investments, and unpaid legacies belonging to any pastoral charge or organization thereof in his district; to report annually to the annual conference an accurate record of all financial transactions pertaining to abandoned properties; to procure statistics and to have the records of his district conference at the annual conference for examination; to act as the judicial officer of his district and decide all questions of law when submitted to him in writing; to promote all the interests of the church within the bounds of his district in coöperation with the pastors and the quarterly conferences; and to give particular attention to such matters as: the establishment of new preaching places and the organization of new congregations wherever needed; missionary and social service interests and activities, including the woman's societies of Christian service, hospitals, homes, and orphanages; Christian education, including religious schools and youth organizations; lay activities; and perform such other duties as the discipline may direct." A district superintendent is appointed for a term of one year. He cannot serve more than six consecutive terms, and at the expiration of his last term he is returned to a pastorate and becomes subject to another district superintendent. On January 1, 1943, the property in question was occupied by Dr. Cairns, the then superintendent. His term expired on June 13, 1943, and he was succeeded by Dr. Francis D. Taylor. Dr. Taylor during his term of office "visited each church in his district once a year and many of them two to four times a year. At times he conducted a funeral or performed a wedding ceremony in the family of a minister or among the

trustees of the church organization, and visited the sick among these groups. In the absence of the pastor, and when so requested, he would officiate at weddings and funerals among church members." The assessors, valuing the property in question at $9,700, on January 1, 1943, assessed a tax thereon at the rate of $36 per $1,000 in the amount of $349.20. The application of the taxpayers for an abatement of the tax to the extent that parsonages are exempt under the governing statute ($5,000) was denied, and the taxpayers appealed.

It is the contention of the taxpayers that the property in question is a parsonage within the meaning of the statute. They rely largely upon definitions contained in dictionaries, and in particular upon *Roman Catholic Apostolic Church in the Philippines* v. *Hastings*, 5 Phil. 701, 705, referred to in *Assessors of Boston* v. *Old South Society in Boston*, 314 Mass. 364, 366, the first case in which the governing statute, as amended by St. 1938, c. 317, was interpreted by this court. Quoting from the case first cited, in the latter case the court said that "the 'English word "parsonage" as derived from American usage must be read, not in a technical or ecclesiastical sense, but in the broad meaning of a ministerial residence used in connection with any place of worship of any denomination.' It is but a house owned by, or held in trust for, a religious organization for religious uses in which a minister serving those uses lives." This statement is stressed by the taxpayers.

In the case first cited above, however, the residence was that of the Roman Catholic archbishop of Manila whose "special church" was the Cathedral Church, which was separated from the residence by but one intervening building, and the residence communicated with the church by a street leading directly thereto. In *Assessors of Boston* v. *Old South Society in Boston*, 314 Mass. 364, the parsonage in question was the residence of the associate minister in the particular place of worship of the society, and in *St. Joseph's Church* v. *Detroit*, 189 Mich. 408, the word parsonage was interpreted to mean land or a house belonging to a parish and appropriated to the maintenance of the

incumbent or settled pastor of a church. The case of *Bishop's Residence Co.* v. *Hudson*, 91 Mo. 671, relied upon by the taxpayers, was controlled by a statute different in terms from that which governs here. And in *State* v. *Board of Foreign Missions of Augustana Synod*, 221 Minn. 536, also cited by the taxpayers, the decision in favor of exemption was made without reference to whether the residence in question be considered a parsonage or not, and under a statute far broader in its terms than is ours, which, under the familiar rule concerning statutes granting exemptions from taxation, must be strictly construed. *Boston Symphony Orchestra, Inc.* v. *Assessors of Boston*, 294 Mass. 248, 257, and cases cited. We have not discovered any case decided under a statute like ours where it has been held that, by the use of the word parsonage, it was intended that it should be interpreted other than as the residence of a minister used in connection with his duties in a house of religious worship.

In the present case the occupant of the property in question, although a minister and having supervisory powers of very many churches in the district of which he was superintendent, was not the incumbent as a minister of any of them. We are of opinion that the real estate involved was not a parsonage within the meaning of G. L. (Ter. Ed.) c. 59, § 5, Eleventh, as amended by St. 1938, c. 317, that is, "a ministerial residence used in connection with any place of worship." *Assessors of Boston* v. *Old South Society in Boston*, 314 Mass. 364, 366. See *East Orange* v. *Church of Our Lady of The Most Blessed Sacrament*, 21 N. J. Misc. 374, 376–377; *State* v. *Kittle*, 87 W. Va. 526, 529.

*Decision for the assessors.*