849 P.2d 83

In the Matter of the Appeal of the Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter–Day Saints from the Order of the Board of Equalization of Ada County For 1987.

The CORPORATION OF the PRESIDING BISHOP OF the CHURCH OF JESUS CHRIST OF LATTER–DAY SAINTS, Petitioner–Respondent,

v.

ADA COUNTY, Idaho; Ada County Assessor; Board of Equalization, Respondents–Appellants.

No. 19087.

Supreme Court of Idaho, Boise, December 1992 Term.

Feb. 26, 1993.

Rehearing Denied April 22, 1993.

Greg H. Bower, Ada County Pros. Atty. and Eric T. Krening, Deputy Pros. Atty., Boise, for respondents-appellants. Eric T. Krening, argued.

Moffatt, Thomas, Barrett, Rock & Fields, Boise, and Kirton, McConkie & Poelm, Salt Lake City, UT, for petitioner-respondent. David M. McConkie, argued.

McDEVITT, Chief Justice.

## BACKGROUND

The Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter–Day Saints is a Utah Corporation sole, incorporated to purchase and sell property for the Church, pursuant to Utah Code Ann. § 16–7–1. The CPB qualifies as a charitable entity under I.R.C. 501(c)(3). The CPB owns a parcel of land in Boise improved with a two-story, five-bedroom home used as the residence of the president of the Idaho Boise Mission and his wife. The property has enjoyed tax-exempt status since its purchase in 1979 until 1987. The mission president is an ordained lay minister who is unpaid and usually serves three years. The service is full-time, and requires the president to give up his present home and job for the interim. In this leadership role, the president serves the spiritual and physical needs of 157 full-time lay missionaries. The missionaries volunteer for two unpaid years of service, financed by themselves, their families or other church members.

The president receives a living allowance, subsidizing his expenses from his personal funds. He receives no vacation during his three-year term. The president usually puts in seventeen hours a day, seven days a week, as administrator, counselor, nurse, teacher, preacher, and guide for the missionaries. He considers his primary responsibility to be the spiritual, physical, and emotional well-being of the missionaries serving under him. The missionaries reside where they are assigned, anywhere

from LaGrande, Oregon, to Jackson Hole, Wyoming, and from Riggins, Idaho, to Jackpot, Nevada. No other church person is authorized to be the ecclesiastical leader of the missionaries. The president holds worship services with the missionaries in a different area each week. Most of the services are held in church buildings, with some in the subject home. The missionaries attend worship services regularly at their local meetinghouse, presided over by the local bishop, and never all congregate in one location. Every missionary either visits the president or is visited by him at least monthly.

In addition to its use as the president's residence, the property is used to house missionaries from around the world for a few days before and after their missions and when they are too sick to stay in their normal accommodations. The home is used for interviews and for meetings with church leaders. The president conducts most of his administrative functions from a mission office on Vista Avenue in Boise, Idaho. The residence is being challenged as a property which does not qualify as a parsonage under I.C. § 63–105B, or as charitable use property under I.C. § 63–105C.[1]

The title ordinarily given to LDS ministers who preside over congregations is "bishop." In general, LDS bishops do not work full-time for the church. Instead, they have other jobs and also own their own homes. The people who make up the bishop's congregation are generally families, elderly couples, and some singles, all of which typically pursue outside careers. The average congregation in Idaho exists within a relatively small geographically contiguous area. Members are free to at-

tend other congregations, but may receive counseling and guidance only from their own bishop. The bishop of every congregation has a separate record of each member. The record follows the member when the member moves. When individuals go on missions, their membership records stay with their home bishop.

The County has no written guidelines or standards for determining when an ecclesiastical residence qualifies for tax exemption as a parsonage. If the assessors have a question about a religion's request for an exemption, they ask for an opinion from the prosecutor's office. Upon the recommendation of the prosecutor's office, Ada County denied the Mission Home a tax exemption in the year 1987, under I.C. §§ 63–105B and 63–105C. The decision was ratified by the Board of Tax Appeals, and the CPB appealed to the district court for *de novo* review. The case was tried June 25, 1990, and the district court granted the exemption under both I.C. §§ 63–105B and 63–105C. On appeal to this Court, we must resolve the following issues:

I. Whether the Mission President's home is a "parsonage" such that it qualifies for an *ad valorem* tax exemption under I.C. § 63–105B.

II. Whether the Mission President's home qualifies for an *ad valorem* tax exemption under I.C. § 63–105B, on the basis that it is used for any combination of religious worship, educational purposes and recreational activities.

III. Whether the Mission President's home qualifies for an *ad valorem* tax exemption under I.C. § 63–105C, as property owned by a charitable organization and

---

1. Idaho Code § 63–105B sets forth property which is exempt from taxation. It provides:
 The following property is exempt from taxation: Property belonging to any religious corporation or society of this state, used exclusively for and in connection with public worship, and any parsonage belonging to such corporation or society and occupied as such, and any recreational hall belonging to and used in connection with the activities of such corporation or society; and this exemption shall extend to property owned by any reli-

gious corporation or society which is used for any combination of religious worship, educational purposes and recreational activities, not designed for profit.
 Idaho Code § 105C states that:
 The following property is exempt from taxation: Property belonging to any fraternal, benevolent, or charitable corporation or society ... used exclusively for the purposes for which such corporation or society is organized....

used exclusively for that organization's charitable purposes.

## STANDARD OF REVIEW

■ On appeal, the reviewing court will not disturb the district court's factual findings if supported by substantial and competent evidence. *Evangelical Lutheran Good Sam. Soc. v. Board of Equalization of Latah County,* 119 Idaho 126, 127, 804 P.2d 299, 300 (1991). However, this Court is not bound by the legal conclusions of the district court and is free to draw its own conclusion from the facts presented. *Clark v. St. Paul Property & Liab. Ins. Cos.,* 102 Idaho 756, 757, 639 P.2d 454, 455 (1981).

■ Specifically, the questions of law in this case involve statutory interpretation. Under Article II, § 1, Article III §§ 1 and 15, and Article V, §§ 2 and 13 of the Idaho Constitution, it is solely the province of the legislature to make laws and the duty of the Court to construe them and, if a law, as construed by the court, is to be changed, that is a legislative not a judicial function. *Mead v. Arnell,* 117 Idaho 660, 667, 791 P.2d 410, 417 (1990); *In re Speer,* 53 Idaho 293, 23 P.2d 239 (1933).

■ This Court has consistently adhered to the primary canon of statutory construction that where the language of the statute is unambiguous, the clear expressed intent of the legislature must be given effect and there is no occasion for construction. *Ottesen v. Board of Commrs. of Madison County,* 107 Idaho 1099, 1100, 695 P.2d 1238, 1239 (1985). Moreover, unless a contrary purpose is clearly indicated, ordinary words will be given their ordinary meaning when construing a statute. *Bunt v. City of Garden City,* 118 Idaho 427, 430, 797 P.2d 135, 138 (1990). In construing a statute, this Court will not deal in any subtle refinements of the legislation, but will ascertain and give effect to the purpose and intent of the

legislature, based on the whole act and every word therein, lending substance and meaning to the provisions. *George W. Watkins Family v. Messenger,* 118 Idaho 537, 539–40, 797 P.2d 1385, 1387–88 (1990).

## I.

## THE I.C. § 63–105B "PARSONAGE" TAX EXEMPTION

### A. *Statutory Construction*

The constitution authorizes the legislature to "allow such exemptions from taxation from time to time as shall seem necessary and just...." Idaho Const. art. VII, § 5. This rather general empowerment was born after extensive debate at the Constitutional Convention on the matter of property tax exemptions. Constitutional Convention—art. VII, § 5, p. 1706. The Convention chose to quash language borrowed from Colorado's constitution specifically exempting all church properties, and several innovative substitutions therefor, in favor of the broad empowerment, indicating that the Convention clearly intended that the legislature should have the sole right to determine what property should be exempt from taxation, and not be constrained by definitive constitutional provisions. *Simmons v. Idaho State Tax Comm'n,* 111 Idaho 343, 723 P.2d 887 (1986); *Achenbach v. Kincaid,* 25 Idaho 768, 140 P. 529 (1914). Pursuant to the authority of art. VII, § 5, the legislature embarked on a dynamic, abiding course of prescribing limited *ad valorem* tax exemptions. It saw fit to carry over the language of the territorial statute exempting religious property into the law of the state until 1913,[2] at which time the legislature penned a revision. The statute has remained unchanged since then, codified as I.C. § 63–105B.

■ Idaho case law requires that all tax exemption statutes be strictly and narrowly construed against the taxpayer, who must

---

**2.** The territorial statute reads:
The following property is exempt from taxation ... churches, chapels and other buildings, with the lots of ground appurtenant thereto and used therewith, belonging to any

church organization or society and used for religious worship, and from which no rent is derived; with their furniture and equipments;
...
Idaho Rev.Stat. § 1401 (1887).

show a clear entitlement, and in favor of the state. Courts may not presume exemptions, nor may they extend an exemption by judicial construction where not specifically authorized. *Bistline v. Bassett*, 47 Idaho 66, 71, 272 P. 696, 701 (1928). *See also Bogus Basin Recreational Assoc., Inc. v. Boise County Bd. of Equalization*, 118 Idaho 686, 799 P.2d 974 (1990); *Canyon County Assessor v. Sunny Ridge Manor, Inc.*, 106 Idaho 98, 675 P.2d 813 (1984). The language of exemption statutes must be given its ordinary meaning and an exemption will not be sustained unless within the spirit as well as the letter of the law. *Evangelical Lutheran Good Sam. Soc. v. Board of Equalization of Latah County*, 119 Idaho 126, 129, 804 P.2d 299, 302 (1991).

 Tax exemptions exist as a matter of legislative grace, epitomizing the antithesis of traditional democratic notions of fairness, equality, and uniformity. *Canyon County, Idaho Assessor v. Sunny Ridge Manor*, 106 Idaho 98, 102, 675 P.2d 813, 816 (1984). Therefore, they are to be construed according to the "strict but reasonable" rule of statutory construction. *Evangelical Lutheran*, 119 Idaho at 130, 804 P.2d at 303; *Bogus Basin Rec. Assoc. v. Boise County Bd. of Equalization*, 118 Idaho 686, 799 P.2d 974 (1990); *North Idaho Juris. of Episcopal Churches v. Kootenai County*, 94 Idaho 644, 647, 496 P.2d 105, 108 (1972). When an ambiguity arises in construing tax exemption statutes, the court must choose the narrowest possible reasonable construction.

*B. Construction of I.C. § 63–105B*

 As noted above, the constitution imbues this Court with the often formidable task of construing ambiguous statutory provisions. Because the legislature has thus far chosen to leave the courts with as little guidance in construing the I.C. § 63–105B "parsonage" exemption as the Convention left the legislature in creating such exemptions, and because the statute is clearly capable of more than one reasonable interpretation, it is incumbent upon this Court to construe I.C. § 63–105B. In construing this statutory provision, this Court is dealing with a case of first impression. In an attempt to discern and implement the intent of the legislature, we "seek edification from the statute's legislative history" and the contemporaneous context at enactment. *Leliefeld v. Johnson*, 104 Idaho 357, 367, 659 P.2d 111, 121 (1983). In addition, given that the legislative history of this provision is virtually nonexistent, it is both appropriate and necessary to "seek enlightenment in the decisions of sister courts which have resolved the same or similar issues." *Id.*

Constrained by the doctrine of strict constructionism, we must choose the most narrow, yet reasonable, definition of the disputed terms. We begin with an analysis of standard dictionary definitions of the terms within the provision, reflecting most closely the definition contemplated by the enacting legislature. *Black's Law Dictionary* defines a parsonage as "a certain portion of lands, tithes and offerings, established by law, for the maintenance of *the* minister who has the cure of souls. The word is more generally used for the house · set apart for the residence of *the* minister." *Black's Law Dictionary* 1273 (4th ed. 1968) (emphasis added). It further defines "parson" as the rector of a parish, and defines "rector" as "one who rules or governs; the spiritual head and presiding officer of church; a clergyman elected by the members of the parish to have permanent charge of it. He is the official head of the parish. In English law, he that has full possession of a parochial church." *Id.* at 1147. *Ballentine's Law Dictionary* defines "parsonage" as:

[A] dwelling house occupied by the pastor of a church, ordinarily owned by the church. When a church has acquired all the ecclesiastical rights it becomes, in the language of the law, a rectory or parsonage which consists of a glebe, tithes, and oblations established for the maintenance of the parson or rector to have cure of souls within the parish.

*Ballentine's Law Dictionary* 915 (3d ed. 1969). The term "parsonage" is also defined as "the residence of a parson or clergyman, as provided by the parish or

church," *Random House Dictionary of the English Language* (1966); as "a certain portion of lands, tithes and offerings, for the maintenance of the parson of a parish; The glebe and house, or the house only, appropriated by a parish or ecclesiastical society to the maintenance or use of the incumbent or settled pastor or minister," *Webster's New International Dictionary* (2d ed. 1954); and as "the rector's house. Also, in later use, the house of a vicar, perpetual curate, or other incumbent of a parish or parochial district; sometimes applied to the residence provided for any minister of religion." *Oxford New English Dictionary* (1909). A neutral distillation of these definitions leads us to adopt the narrow yet reasonable definition of "parsonage" offered by the County, rather than the overly broad definition espoused by the CPB. It is evident that all of the dictionaries refer to a residence occupied by the incumbent minister having ecclesiastical domain over a contained body of parishioners or church members, formally referred to as a congregation.[3] Although it is arguable that a broader interpretation can be derived from the tomes, we are not at liberty to embrace an "arguably broad" interpretation under the doctrine of strict constructionism. It is not clear that the legislature intended to extend the word "parsonage" as was used in common parlance at the time this statute was enacted, to include any property housing any minister. Rather, the language "occupied as such" indicates the legislature's intent that the parsonage be occupied in a typical or traditional manner by a parson, pastor, or any religion's equivalent thereof.

▆▆ We hold that a parsonage is not merely a residence owned by a religious organization in which an ordained member of that organization resides. The definition of "parsonage" as employed in I.C. § 63–105B, is a building owned by a religious organization occupied as a residence by a designated minister who ministers to a specific localized congregation that gathers to worship at frequent and regular intervals.

The adoption of this narrow yet reasonable definition of the term "parsonage" is in harmony with the decisions of our sister states that have had occasion to resolve the same issue. In Indiana, where a statute exempts property owned by churches and used as parsonages, the Indiana Tax Court denied a parsonage exemption to property owned by a Church and occupied by ordained ministerial employees. *Indiana Assoc. of Seventh–Day Adventists v. Board of Tax Comm.*, 512 N.E.2d 936 (Ind.T.C. 1987). The court applied the doctrine of strict construction, holding that, in order to qualify as a parsonage, "the *minimum* which must be shown is that individuals residing in the parsonage perform the pastoral duties of an ordained minister." 512 N.E.2d at 939. Whereas the church did not even meet the minimum burden, the court did not bother to determine whether the scope of parsonage was further limited to a "house appropriated to a settled pastor of a church having a local congregation," simply citing with approval those courts holding as much. *Id.* A Kansas statute exempts all parsonages "owned by a church society and actually and regularly occupied and used exclusively as a residence by a minister or other clergyman of such church who is actually and regularly engaged in conducting the services and religious ministrations of such society." Kan.Stat.Ann. § 79–201 (1989). The Kansas Supreme Court interpreted this more succinctly drawn statute to exempt only the residence of a pastor for each congregation, refusing to extend the exemption to the residence of the bishop of the diocese. *Griswold v. Quinn*, 97 Kan. 611, 156 P. 761 (1916). The bishop argued that, because the Cathedral is known as the "Bishop's Cathedral," and because the bishop exercises his authority over the entire body of churches in his jurisdiction, he is within the definition of a pastor. The court held that the bishop

---

**3.** "Congregation" is defined as "an assembly of persons met for the worship of God, and for religious instruction, a body of people who habitually so meet; a company or order of religious persons under a common rule; a group of monasteries forming a subdivision of an order which agree to unite in closer ties of discipline and doctrine." *Webster's New International Dictionary,* (2d ed. 1954).

was not the pastor of a specific church, stating that "the almost universal rule is that each church congregation has but one pastor ... if the legislature intended to exempt from taxation more than one parsonage for each congregation, it would doubtless have said so in express terms." 156 P. at 762. The bishop "is a pastor with certain authority over all the churches in his jurisdiction, but the work of the local church is carried on by the local pastor, who is called the dean. As we construe the statute, the church at Salina is entitled to have the residence of its pastor exempt from taxation. The court has found that the dean is the pastor of that church, and that his residence is treated as exempt." *Id.*

The definition adopted by this Court today gleans the most support from similar constructions embraced by our sister states having almost identical statutes, namely, Michigan and New Jersey. The Michigan statute exempts any parsonage owned by a religious society and "occupied as a parsonage." Mich.Comp.L.Ann. § 211.75 (1986). In a series of cases, the Michigan appellate courts applied this provision to various properties and ultimately derived the requirement that, in order to qualify for exemption, the property must be occupied by a minister having a localized, identifiable congregation. *See Saint John's Evan. Lutheran Church v. City of Bay City*, 114 Mich.App. 616, 319 N.W.2d 378 (1982); *Michigan Christian Campus Min., Inc. v. City of Mount Pleasant*, 110 Mich.App. 787, 314 N.W.2d 482 (1981); *Congregation B'nai Jacob v. City of Oak Park*, 102 Mich.App. 724, 302 N.W.2d 296 (1981); *Saint Matthew Lutheran Church v. Delhi Township*, 76 Mich.App. 597, 257 N.W.2d 183 (1977); *St. Joseph's Church v. City of Detroit*, 189 Mich. 408, 155 N.W. 588 (1915). Likewise, the New Jersey statute exempts all buildings "actually occupied as a parsonage by the officiating clergyman of any religious corporation." N.J.Stat. Ann. § 54:4–3.5 (1986). The New Jersey appellate courts, passing on various nonjurisdictional case law and dictionary defini-

tions, held that "an 'officiating clergyman' [within the meaning of the statute] when textually associated with 'parsonage' must be a settled or incumbent pastor or minister, that is, a pastor installed over a parish, church or congregation.... And when he is an 'officiating clergyman of any religious corporation' he must be serving the needs of a reasonably localized and established congregation. In this sense a congregation signifies an assemblage or union of persons in society to worship their God publicly in such manner as they deem most acceptable to Him, at some stated place and at regular intervals." *Saint Matthew's Lutheran Church for the Deaf v. Division of Tax Appeals*, 18 N.J.Super. 552, 87 A.2d 732, 735 (App.Div.1952) (citations omitted). *See also International Missions, Inc. v. Borough of Lincoln Park*, 87 N.J.Super. 170, 208 A.2d 431 (App.Div.1965); *Township of Teaneck v. Lutheran Bible Institute*, 20 N.J. 86, 118 A.2d 809 (1955).

Other states requiring a residence to house a pastor or minister with an identifiable local congregation in order to qualify for the statutory "parsonage" exemption include Maryland, Massachusetts, Tennessee, Wisconsin, and Washington. *See East Coast Conf. of Evan. Cov. Church of Amer. v. Supervisor of Assessments*, 40 Md.App. 213, 388 A.2d 177 (1978); *Assessors of Boston v. Old South Soc.*, 314 Mass. 364, 50 N.E.2d 51 (1943); *Worcester Dist. Stewards New England Conf. of Methodist v. Assessors of Worcester*, 321 Mass. 482, 73 N.E.2d 898 (1947); *Blackwood Bros. Evan. Assoc. v. Board of Equalization*, 614 S.W.2d 364 (Tenn.Ct. App.1980); *Missionaries of Our Lady of La Salette v. Michalski*, 15 Wis.2d 593, 113 N.W.2d 427 (1962); *Pacific Northwest Annual Conf. of United Meth. Church v. Walla Walla County*, 82 Wash.2d 138, 508 P.2d 1361 (1973).

On the other hand, if our legislature had intended for the religious property exemption to extend to residences occupied by church officials not specifically associated with a local congregation, it could have

worded its statute much like Illinois.[4] Instead, the legislature chose to employ a term of art, "parsonage," with contemporary established meanings attached thereto.

Applying the foregoing premises to the case at bar, it is clear that the Mission Home does not qualify for exemption as a "parsonage belonging to [any religious corporation or society] and occupied as such" within the strict parameters of I.C. § 63–105B. The statute is apparent in its requirements. The property owned by a religious organization must be used appropriately to qualify for exemption. It must be used as a parsonage. The mission president has no affiliated meetinghouse, and no local congregation by any stretch of the imagination. Nor does the mission president *serve the function* of a minister or parson, which is an indelible element of the "parsonage" exemption. The testimony from the Corporation's witnesses unequivocally establishes that the mission president never meets with all the missionaries at one time in one place because it is too inconvenient; the mission president meets with subgroups of missionaries every two months or at a rate of no more than one-eighth as often as prescribed by the LDS church; the missionaries attend sabbath services and other services at the church in the area where they are staying; and all LDS congregations are localized, even those that have specialized memberships.

Let it be understood that we are in no way questioning the sectarian validity of the mission president's ministerial designation. This definition of parsonage is simple, neutral, and uniform in its application. It requires no inquiry into the views of the religious organization or structure. It simply makes inquiries implicitly mandated by I.C. § 63–105B, requiring qualifying church-owned property to be inhabited by a minister in function as well as in name. This definition affects only secular aspects of the calling, it does not interfere with the individual's religious prowess. The localized congregation requirement is based on sound policy that, since the *ad valorem* tax burden of exempted property will be shifted onto the people of the county, those people should receive something in return—a place to worship in the community and a minister to conduct the services.

## C. Constitutionality of I.C. § 63–105B

Respondent argues that, in its attempt to define and lend substantive uniformity to the "parsonage" exemption, the County drifts dangerously into the sacred seas jealously guarded by the Establishment Clause of the First Amendment, applied to the states through the Due Process Clause of the Fourteenth Amendment.[5] We disagree. By defining statutory concepts in such a manner as to enable itself to carry out its function, the County, as the implementing body, is fulfilling a constitutional mandate. In essence, First Amendment religious protections provide that "government may neither compel affirmation of a repugnant belief, nor penalize or discriminate against individuals or groups because they hold religious views abhorrent to the authorities, nor employ the tax-

4. Illinois' statute provides an exemption for:
[A]ll property used exclusively for religious purposes ... including all such property owned by churches or religious institutions ... and used in conjunction therewith as parsonages or other housing facilities provided for ministers (including bishops, superintendents, and similar church officials whose ministerial duties are not limited to a single congregation), their spouses and ... performing the duties of their vocation as ministers at such religious institutions....
Ill.Ann.Stat. ch. 120.500.2 (1991). The Illinois Court applied the exemption statute to an apartment building owned by a religious organiza-

tion and used to house missionaries on furlough between foreign missions, granting the exemption. *Evangelical Alliance Mission v. Department of Revenue,* 164 Ill.App.3d 431, 115 Ill.Dec. 492, 517 N.E.2d 1178 (1987). Employing the strict constructionism standard, the court held that the broad language of the statute evidences the intent of the legislature to include residences of other church officials who did not necessarily serve a local congregation. 115 Ill. Dec. at 500, 517 N.E.2d at 1186.

5. "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. Const. amend. I.

ing power to inhibit the dissemination of particular religious views." *Sherbert v. Verner*, 374 U.S. 398, 402, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965 (1963). *See also Everson v. Board of Educ.*, 330 U.S. 1, 15, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1947).

■■■ Initially, it is important to recognize that the exemption statute itself strikes the shores of the First Amendment because, by its own terms, the only entities entitled to the exemption are religious organizations.[6] However, the exemption, neutral on its face, skirts the treacherous shoals secreted beneath the shifting tides of the First Amendment, aboard *Walz v. Tax Comm'n of the City of New York*, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970). Finding the New York statutory property tax exemption for "houses of religious worship" to be constitutional, the *Walz* court recognized that the legislative purpose of a property tax exemption is neither sponsorship of nor hostility toward religion. *Walz*, 397 U.S. at 672, 90 S.Ct. at 1413. The Court was not troubled by the fact that New York tax assessors would have the continuing burden of ascertaining which properties qualified as "houses of religious worship," thereby rejecting Walz' excessive entanglement argument. *Id.* at 676, 90 S.Ct. at 1415.[7]

■■■ Whereas the Idaho legislature has chosen not to implement an unlimited property tax exemption for religious prop-

**6.** Statutory tax exemptions for religious organizations are not mandated by the Free Exercise Clause, nor prohibited by the Establishment Clause. *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 109 S.Ct. 890, 103 L.Ed.2d 1 (1989).

**7.** In other cases before the United States Supreme Court in which the Court endorsed a tax on religions, the Court defined such terms as "religious practices," "religious purposes," and "to or for the use of charitable [religious] organizations" without hesitation. *Engel v. Vitale*, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962); *Hernandez v. Commissioner*, 490 U.S. 680, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989); *Davis v. United States*, 495 U.S. 472, 110 S.Ct. 2014, 109 L.Ed.2d 457 (1990).

Other state courts have also defined such terms as "religious organization," "religious purposes", "parsonage" and "religious worship" without constitutional problems. *See Young Life v. Division of Employment & Training*, 650 P.2d 515, 523 (Colo.1982) (Court found no excessive entanglement where it had to determine whether Young Life was a church for purposes of an exemption from unemployment security tax. "Any tax exemption for religious organizations entails an examination of whether a particular group or organization meets the statutory requirement for exemption. Thus, the entanglement problem claimed by Young Life occurs with respect to every religious tax exemption. Such exemptions are clearly constitutional."); *Missouri Church of Scientology v. State Tax Comm'n*, 560 S.W.2d 837 (Mo.1977) (court denied property tax exemption to Church under statute granting exemption for property used exclusively for religious worship, defining such as requiring at least a belief in a Supreme Being. Court held such definition does not violate First Amendment. Definition derived from standard dictionary references and reliance on decisions from other jurisdictions.); *Religious Soc'y of Families v. Assessor of Town of Carroll*, 73 Misc.2d 923, 343 N.Y.S.2d 159, 161–62 (1973) (court defined "religious organization" as contemplated by County tax exemption statute for such organizations, relying on traditional definitions. "If the courts, as constitutionally required, are to refrain from meddling in matters religious, they should restrict the definition of religion and religious society to its common, dictionary meaning."). *See also Board of Trustees of the Kansas East Conf. of the United Methodist Church v. Cogswell*, 205 Kan. 847, 473 P.2d 1 (1970); *Griswold v. Quinn*, 97 Kan. 611, 156 P. 761 (1916); *East Coast Conf. of Evan. Cov. Church of Amer. v. Supervisor of Assessments*, 40 Md.App. 213, 388 A.2d 177 (1978); *Assessors of Boston v. Old South Soc.*, 314 Mass. 364, 50 N.E.2d 51 (1943); *Worcester Dist. Stewards New England Conf. of Methodist v. Assessors of Worcester*, 321 Mass. 482, 73 N.E.2d 898 (1947); *Saint John's Evan. Lutheran Church v. City of Bay City*, 114 Mich.App. 616, 319 N.W.2d 378 (1982); *Michigan Christian Campus Min., Inc. v. City of Mount Pleasant*, 110 Mich.App. 787, 314 N.W.2d 482 (1981); *Congregation B'nai Jacob v. City of Oak Park*, 102 Mich.App. 724, 302 N.W.2d 296 (1981); *Saint Matthew Lutheran Church v. Delhi Township*, 76 Mich.App. 597, 257 N.W.2d 183 (1977); *St. Joseph's Church v. City of Detroit*, 189 Mich. 408, 155 N.W. 588 (1915); *International Missions, Inc. v. Borough of Lincoln Park*, 87 N.J.Super. 170, 208 A.2d 431 (App.Div.1965); *Township of Teaneck v. Lutheran Bible Institute*, 20 N.J. 86, 118 A.2d 809 (1955); *St. Matthew's Lutheran Church for the Deaf v. Division of Tax Appeals*, 18 N.J.Super. 552, 87 A.2d 732 (App.Div.1952); *McMasters v. State*, 21 Okl.Cr. 318, 207 P. 566 (1922); *Blackwood Bros. Evan. Assoc. v. Board of Equalization*, 614 S.W.2d 364 (Tenn.Ct.App.1980); *Missionaries of Our Lady of La Salette v. Michalski*, 15 Wis.2d 593, 113 N.W.2d 427 (1962); *Pacific Northwest Annual Conf. of United Meth. Church v. Walla Walla County*, 82 Wash.2d 138, 508 P.2d 1361 (1973).

erties, it is our Constitutional duty to protect and advance only those exemptions specifically delineated by the legislature. Just as in *Walz*, the exemption "restricts the fiscal relationship between church and state, and tends to complement and reinforce the desired separation insulating each from the other." *Walz*, 397 U.S. at 672, 90 S.Ct. at 1413. Separation, however, cannot realistically mean absence of all contact. *Id.* at 670, 90 S.Ct. at 1412. *See also Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 10, 109 S.Ct. 890, 896, 103 L.Ed.2d 1 (1989) ("government need not resign itself to ineffectual diffidence because of exaggerated fears of contagion of or by religion, so long as neither intrudes unduly into the affairs of the other."); *Lemon v. Kurtzman*, 403 U.S. 602, 614, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745 (1971) ("Our prior holdings do not call for total separation between church and state; total separation is not possible in an absolute sense. Some relationship between government and religious organizations is inevitable"); *Zorach v. Clauson*, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952) (the First Amendment does not absolutely prohibit all contact between Church and State; otherwise, the State and religion would be aliens to each other—hostile, suspicious, and even unfriendly). The minimal nexus germinating from the County's application of the exemption in accordance with today's holding, like that created by the United States Supreme Court in *Walz*, is harbored safely within the assuasive atoll afforded by *Walz*, *Lemon*, and their progeny.[8]

■■■■■ When it is claimed that a denominational preference exists, the initial inquiry is whether the law facially differentiates among religions. If no such facial preference exists, as in this case, we proceed to apply the customary three-pronged Establishment Clause inquiry derived from *Lemon*. The first *Lemon* requirement, that the law at issue serve a secular legislative purpose, aims at preventing the relevant governmental decision maker from abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters. *Corporation of the Presiding Bishop v. Amos*, 483 U.S. 327, 335, 107 S.Ct. 2862, 2868, 97 L.Ed.2d 273 (1987). The line drawn by the County in applying I.C. § 63–105B, does not differentiate among sects. There is no allegation that the statute or the County's application of it is born of animus to religion in general or Mormonism in particular. The provision is neutral both in design and purpose.[9]

■■■■■ The second prong of *Lemon* requires that the CPB show that the government itself has advanced religion through its actions. *Amos*, 483 U.S. at 337, 107 S.Ct. at 2869. The primary effect of the County's application of I.C. § 63–105B neither advances nor inhibits religion. It is not alleged here that the statute involves direct government action endorsing religion or a particular religious practice. It is well-established that "a statute primarily having a secular effect does not violate the Establishment Clause merely because it 'happens' to coincide or harmonize with the tenets of some or all religions." *Hernandez v. Commissioner*, 490 U.S. 680, 696, 109 S.Ct. 2136, 2147, 104 L.Ed.2d 766 (1989).

---

**8.** *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), formally states the three-part test for determining the constitutionality of governmental action touching religion: In order to pass Constitutional muster, under the establishment clause, the given state action must: 1) have a secular purpose; 2) have the primary or principal affect be one that neither advances nor inhibits religion; and 3) not foster an excessive entanglement with religion. *Id.* at 612–13, 91 S.Ct. at 2111. *See also Larson v. Valente*, 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982); *Jimmy Swaggart Ministries v. Board of Equalization*, 493 U.S. 378, 110 S.Ct. 688, 107 L.Ed.2d 796 (1990); *Corporation of the Presiding*

*Bishop v. Amos*, 483 U.S. 327, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987).

**9.** "At the outset, it is undeniable that a generally applicable tax has a secular purpose and neither advances nor inhibits religion, for the very essence of such a tax is that it is neutral and nondiscriminatory on questions of religious belief. Thus, whatever the precise contours of the Establishment Clause, its undisputed core values are not even remotely called into question by the generally applicable tax in this case." *Jimmy Swaggart Ministries*, 493 U.S. at 394, 110 S.Ct. at 698.

■ Thirdly, the application threatens no excessive entanglement between church and state. To be sure, ascertaining whether property is used as a parsonage may require the County to ascertain from the institution the nature of the occupant and their relation to the church members. But routine regulatory interaction which involves no inquiries into religious doctrine, no delegation of state power to a religious body, and no detailed monitoring and close administrative contact between secular and religious bodies, does not of itself violate the nonentanglement command. *Id.* at 696, 109 S.Ct. at 2147 (citations omitted). *See also Bullock,* 489 U.S. at 21, 109 S.Ct. at 903 (citations omitted) ("While Texas is correct in pointing out that compliance with government regulations by religious organizations and the monitoring of their compliance by government agencies would itself enmesh the operations of church and state to some degree, we have found that such compliance would generally not impede the evangelical activities of religious groups and that the routine and factual inquiries commonly associated with the enforcement of tax laws bear no resemblance to the kind of government surveillance the Court has previously held to pose an intolerable risk of government entanglement with religion."); *Mueller v. Allen,* 463 U.S. 388, 403, 103 S.Ct. 3062, 3071, 77 L.Ed.2d 721 (1983) (a state does not excessively involve itself in religious affairs merely by examining material to determine whether it is religious or secular in nature); *Jimmy Swaggart Ministries v. Board of Equalization,* 493 U.S. 378, 395–96, 110 S.Ct. 688, 699, 107 L.Ed.2d 796 (1990) ("[t]he sorts of government entanglement that we have found to violate the Establishment Clause have been far more invasive than the level of contact created by the administration of neutral tax laws.").

■ It is incumbent upon the CPB to establish that it qualifies for the exemption as it is applied by the County. In the alternative, the CPB must show that the County's application of the statute fails the *Lemon* test, invoking strict scrutiny and thereby shifting the burden to the County to demonstrate the application is necessary to a compelling end. *Amos,* 483 U.S. at 339, 107 S.Ct. at 2670 (where a statute is neutral on its face and motivated by a permissible purpose of limiting governmental interference with the exercise of religion, we see no justification for applying strict scrutiny to a statute that passes the *Lemon* test.); *Larson,* 456 U.S. at 252, 102 S.Ct. at 1687. CPB has provided no such evidence. The CPB argues that restricting the parsonage exemption to residences of traditional congregational pastors is to prefer and advance those organizations over an organization of less orthodox structure. Distilled, this argument is simply that those properties that do not qualify for exemption have been discriminated against. Without patent disparate treatment among religions, strict scrutiny does not apply. Here, the County is not discriminating *among* religions such that strict scrutiny is triggered. Rather, the County is affording a uniform benefit to all religious parsonages that qualify.

## II.

### THE "MIXED USE" *AD VALOREM* TAX EXEMPTION UNDER I.C. § 63–105B

"Churches and other religious institutions, fraternal, benevolent or charitable corporations or societies enjoy no inherent right to exemption from taxation; and their property is taxable except insofar as it is specifically exempt by constitutional provision or statutory enactment." *Malad Second Ward of the Church of Jesus Christ of Latter–Day Saints v. State Tax Comm'n,* 75 Idaho 162, 165, 269 P.2d 1077, 1080 (1954). Respondent claims a tax exemption for the Mission Home under I.C. § 63–105B, as property used for a combination of "religious worship, educational purposes, and recreational activities." We hold that the Mission Home does not qualify for this exemption.

■ Standard rules of statutory interpretation require this Court to give effect to the legislature's intent and purpose, and to every word and phrase employed. *Sweitzer v. Dean,* 118 Idaho 568, 571, 798

P.2d 27, 30 (1990). We will not construe a statute in a way which makes mere surplusage of provisions included therein. *Id.* at 571–72, 798 P.2d at 30–31. The mixed use provision of I.C. § 63–105B, exempting property used for any combination of religious worship, educational purposes and recreational activities, has not previously been analyzed by this Court. Additionally, there is little or no case law from other jurisdictions on point. Accordingly, analysis of this question is almost exclusively reliant on an independent review and construction of the statute itself. When read in context and literally construed, it is evident that the mixed use provision implicitly excludes any use provided for under other portions of the statute not specifically enumerated in the mixed use provision. Moreover, the *North Idaho* doctrine of *pari materia* is not applicable here because it refers to dual qualification under independent statutes, not under independent clauses of the same statute.[10] Thus, the Mission Home does not qualify because it is used for a combination *residence* and place of religious worship, or education, or recreation. No other reasonable interpretation of the statute would give effect to all provisions therein, read in internal harmony.

### III.

### THE "CHARITABLE USE" *AD VALOREM* TAX EXEMPTION UNDER I.C. § 63–105C

■■■■■ The CPB argues that even if the Mission Home fails to qualify for exemption under I.C. § 63–105B, it nonetheless qualifies under I.C. § 63–105C. We disagree. Qualification for an *ad valorem* tax exemption depends upon the ownership and *use* of the property. *Sunset Memorial Gardens v. Idaho State Tax Comm.*, 80 Idaho 206, 217, 327 P.2d 766, 777 (1958)

(emphasis added). An organization seeking to exempt its property from taxation under I.C. § 63–105C, must be charitable and must use its property exclusively for the charitable purposes for which it was designed or for those purposes combined with some other statutorily exempted use. *Evangelical Lutheran Good Samaritan Soc. v. Board of Equalization of Latah Co.*, 119 Idaho 126, 131, 804 P.2d 299, 304 (1990); *Sunset Memorial Gardens,* 80 Idaho at 219, 327 P.2d at 779. The Corporation has the burden of proving clear entitlement to the charitable exemption by satisfying the requirements set forth in *Canyon County Assessor v. Sunny Ridge Manor, Inc.,* 106 Idaho 98, 675 P.2d 813 (1984), and *Coeur d'Alene Public Golf Club, Inc. v. Kootenai Bd. of Equalization,* 106 Idaho 104, 675 P.2d 819 (1984). *See also Bogus Basin Rec. Assoc. v. Boise County Bd. of Equalization,* 118 Idaho 686, 687, 799 P.2d 974, 975 (1990). In *Sunny Ridge,* this Court stated that, rather than seeking to determine a corporation's charitable status solely by means of certain predetermined classifications of the services it provides, the courts look to the public nature of the benefits or services. For a corporation's uses to be considered charitable it is essential that they provide some sort of general public benefit. Considerations include: (1) the stated purpose of the corporation or organization's undertaking, (2) whether its functions are charitable, (3) whether it is supported by donations, (4) whether the recipients of its services are required to pay for the assistance they receive, (5) whether there is general public benefit, (6) whether the income received produces a profit, (7) to whom the assets would go upon dissolution of the corporation, and (8) whether the charity provided is based on need. *Canyon County Assessor*

---

**10.** In *North Idaho Juris. of Episcopal Churches v. Kootenai Co.,* 94 Idaho 644, 496 P.2d 105 (1972), this Court refused to limit the qualification of property belonging to a religious corporation because it happened to be used both for educational purposes under I.C. § 63–105B and for charitable purposes under I.C. § 63–105C. *North Idaho,* 94 Idaho at 645, 496 P.2d 105. The Court held that the doctrine of tax exemption set forth in I.C. § 63–105B and C are not mutu-

ally exclusive, but should be read in pari materia. *Id.* at 650, 496 P.2d 105. "The real property utilized by religious organizations ... should be exempt from ad valorem taxes, since all activities conducted thereon, although in some aspects charitable, and in some aspects educational, are nevertheless directly related to the religious purposes for which the groups are organized." *Id.*

*v. Sunny Ridge Manor,* 106 Idaho 98, 100, 675 P.2d 813, 815 (1984).

The respondent has failed to demonstrate how the use of the Mission Home provides a general public benefit, as required by *Sunny Ridge.* Therefore, we hold that the use made of the Mission Home cannot be considered charitable under *Sunny Ridge* and the Mission Home does not qualify for exemption under I.C. § 63–105C. "[Charitable exemptions] are said to be justified ... by an offsetting benefit to the community. Hence has arisen the test that an institution may be entitled to an exemption where it performs a function which might otherwise be an obligation of government. Where there is no assistance to individuals which might normally require governmental funds ... the institution must meet a stricter test: it must provide benefits to the community at large." *Id.* at 102, 675 P.2d 813. *See also Evangelical Lutheran,* 119 Idaho at 131, 804 P.2d at 304; *Bogus Basin,* 118 Idaho at 688, 799 P.2d at 976; *Sunset Memorial Gardens,* 80 Idaho at 218, 327 P.2d at 773.

 The CPB has not shown that its use of the Mission Home supplants a function "which might otherwise be an obligation of government." Indeed, it would violate the venerable vortex of the Establishment Clause to proclaim that facilitating the diffusion of religious dogma is an "obligation of government." Moreover, the CPB has not demonstrated that its use of the Mission Home meets the stricter test, *i.e.,* that it "provides benefits to the community at large." The CPB argues that the dissemination of its religious views provides a public benefit. However, such a construction of I.C. § 63–105C would violate the well-settled principle of statutory construction that statutes should not be construed to render other provisions meaningless. *Moss v. Bjornson,* 115 Idaho 165, 166, 765 P.2d 676, 677 (1988). To read "charitable objectives" to include the dissemination of a religious dogma and the provision of a residence to a religious official to facilitate such dissemination, would render I.C. § 63–105B, with its specifically delineated religious property exemptions,

superfluous. It can certainly be said that the primary purpose of houses of public worship and "parsonages" is to advance the cause of religion. Therefore, had the Legislature intended to include any organization whose purpose was the advancement of a particular religion within the definition of "charitable," there would have been no need to add the other statute.

The decision of the district court granting an *ad valorem* property tax exemption to respondent CPB under I.C. §§ 63–105B and 63–105C is reversed.

Costs to appellant on appeal.

BISTLINE and TROUT, JJ., and REINHARDT, J. Pro Tem., concur.

JOHNSON, Justice, dissenting.

I respectfully dissent from the Court's opinion.

The Court wrestles mightily with the meaning of "parsonage." In doing so, the Court invokes various dictionaries as well as statutes and decisions from other jurisdictions. I would merely apply a construction that acknowledges that both "parson" and "parsonage" are archaic terms from an earlier era. Both the legislature and this Court have more recently used the term "clergyman" to refer to the leader of a church or religious organization. *E.g.,* I.C. § 30–324 ("If the management of a church is vested in its members pursuant to section 30–314, Idaho Code, the organization meeting shall be held by the members upon the call of the clergyman or lay leader calling the meeting"); I.R.E. 505 (A "clergyman" is a "minister, priest, rabbi, accredited Christian Science Practitioner, or other similar functionary of a religious organization").

In these terms, "parsonage" is nothing more than a clergyman's (or stated in gender-neutral terms clergy's) house. The mighty struggle in which the Court engages would be easily resolved if this straightforward construction were given to the meaning of "parsonage" in I.C. § 63–105B. If so, the Court should have no problem in allowing the exemption for the residence in this case.

Perhaps more significantly, I am convinced that the construction employed by the Court violates the establishment clause of the First Amendment. Will only those "traditional" religious organizations that have a traditional "parsonage" be entitled to the statutory exemption? If so, the result will be to "establish" these religious organizations as favored by the state, at least for ad valorem tax purposes. In my view, the First Amendment prohibits this.