59 A.3d 1001

**B. Marie GREEN, Supervisor of Assessments
of Montgomery County**

v.

**CHURCH OF JESUS CHRIST OF LATTER–DAY SAINTS.**

**No. 35, Sept. Term, 2012.**

Court of Appeals of Maryland.

Jan. 23, 2013.

120

Steven M. Sullivan, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, and William K. Hammond, Asst. Atty. Gen., Baltimore, MD), on brief, for appellant.

Lauri E. Cleary (Martin J. Hutt of Lerch, Early & Brewer, Chtd., Bethesda, MD), on brief, for appellee.

Argued before BELL, C.J., HARRELL, GREENE, ADKINS, BARBERA, McDONALD, and ALAN M. WILNER (Retired, Specially Assigned), JJ.

BARBERA, J.

Maryland's Property Tax Code provides that a "religious group or organization is not subject to property tax if the property is actually used exclusively for," *inter alia,* "a parsonage or convent." Md.Code (2001, 2012 Repl.Vol.), § 7–204 of the Tax–Property Article.[1] We are asked in the present

---

1. § 7–204. **Religious groups or organizations.**

case to interpret and apply to conceded facts the terms "parsonage" and "convent" as they are employed in § 7–204.

The case has its genesis in the request of the Church of Jesus Christ of Latter-day Saints[2] ("the Church") that it be exempt from paying property tax on an apartment complex in Montgomery County, Maryland. The Church owns and uses the complex to house a revolving group of workers who perform religious ceremonies full-time for a two-year period at the Church's Washington, D.C. Temple. The Church seeks to reacquire a property tax exemption that once was granted to the complex but later was rescinded following a periodic review by the Supervisor of Assessments of Montgomery County. The Supervisor of Assessments has taken the position that the apartment complex does not qualify for a property tax exemption under § 7–204 because the complex is not exclusively used as a parsonage or a convent.[3] The Maryland Tax Court agreed with the Supervisor of Assessments, but the Circuit Court for Montgomery County reversed, holding that the complex should be granted the exemption because it qualified as both a parsonage and a convent. For the reasons that follow, we hold that the Tax Court applied the wrong standard in assessing whether the apartment complex constitutes a convent, so we remand the case for the Tax Court to issue an order granting the exemption consistent with the standards we set forth in this opinion. In light of our disposi-

---

Property that is owned by a religious group or organization is not subject to property tax if the property is actually used exclusively for:
 (1) public religious worship;
 (2) a parsonage or convent; or
 (3) educational purposes.
All references hereinafter to the Maryland Code are to the Tax–Property Article.

**2.** According to the official website of the Church of Jesus Christ of Latter-day Saints, the word "day" in "Latter-day Saints" is not capitalized. We shall use the Church's preferred style, except when citing to case names outside of Maryland that do not follow this convention.

**3.** Neither party argues that the apartment complex is used exclusively as a place of "public religious worship," or for "educational purposes," so we do not address these portions of § 7–204.

tion of the case, we do not opine on whether the apartment complex also constitutes a parsonage.

## I.

The Church of Jesus Christ of Latter-day Saints, informally known as the Mormon Church, was founded in 1830 by Joseph Smith. In the years since its founding, the Church has grown to a worldwide membership of roughly 14.4 million people. At a local level, church members are divided geographically into wards, which are comparable to parishes or congregations in other faiths. Each ward is supervised by a bishop, who conducts weekly services for members of the ward at a local chapel. Each ward is part of a larger grouping, called a stake, and each stake is comprised of about ten wards. The stakes, in turn, are a part of a temple district, overseen by a temple president. The Washington, D.C. Temple District is made up of 42 stakes, divided into 425 wards, and covers Maryland, Virginia, the District of Columbia, Pennsylvania, and parts of Ohio, Delaware, New Jersey, and New York.

The Temple is considered to be a sacred site and only members of the Church who are in good standing may visit it. This permission to enter the Temple is referred to as a temple recommend, and it is granted for a limited time to members who strictly follow the Church's teachings. Within the Temple, special religious sacraments, referred to as ordinances, are performed. These ordinances may take place only within the Temple, and they may be performed only by specific Church members, who are called ordinance workers. The ordinances include marriages, baptisms, and confirmations.

The Church is run by lay ministers, rather than paid clergy. Bishops, stake presidents, and ordinance workers are all called into service by the Church and perform their duties without compensation. Ordinance workers generally serve for a period of two years and rotate through different assignments at the Temple. They spend most of their time performing ordinances, but they also teach, instruct, minister, and counsel members of the Church within the Temple. A strict religious

code is demanded of ordinance workers, and, if they do not follow it, they can be dismissed from service. Approximately 400,000 ordinances are performed in the Washington, D.C. Temple in an average year, or roughly 1,600 per day.

The D.C. Temple opened in Kensington, Maryland in 1974. The Temple is generally open 14 hours a day, five days of the week, serving the roughly 145,000 members who live within the D.C. Temple District. The ordinance workers who serve at the Temple mostly come from outside the D.C. area. In order to accommodate ordinance workers from out-of-town, the Church purchased a 44–unit apartment complex for them to live in, located in Kensington about a mile from the Temple. Between 50 to 60 ordinance workers live in the complex, the majority of whom are retired, married couples. The ordinance workers worship together as a ward each Sunday at a chapel located on the Temple grounds. The Church charges the ordinance workers below-market-value rent as a means of off-setting the operating expenses of the complex.

### The 1980 property tax exemption

The Church sought a property tax exemption for the apartment complex in 1979 and was turned down by the Supervisor of Assessments of Montgomery County. The Church sought the exemption pursuant to Article 81, Section 9(c), the then-applicable provision of the Maryland Code that permitted an exemption for properties that were used exclusively for religious purposes.[4] The decision of the Supervisor of Assessments was overturned on April 30, 1980, by a majority vote of the Property Tax Assessment Appeals Board for Montgomery County.

The appeals board stated that it was "persuaded that the apartments are used exclusively to house volunteers who are

---

4. The exemption in place at the time covered the following property: "Property owned by a religious group or organization and actually used exclusively for public religious worship, including parsonages and convents, and property owned by any such group or organization and actually used exclusively for educational purposes." Md.Code (1957, 1980 Repl.Vol.), Article 81, § 9(c).

brought to this area to work exclusively at the Temple, and that the apartments are used to foster this religious purpose." The board noted that the rents charged to the ordinance workers were "so low as to be considered at least a partial subsidy of their housing" and this subsidy was in line with the subsidized housing found in parsonages and convents. The board found the language of the statute to be "somewhat ambiguous" but determined that the purpose of the exemption was to benefit the "residences of persons directly and exclusively involved [in] and dedicated to the perpetuation of public religious worship."

The Church received the exemption until 2008, when the Supervisor of Assessments of Montgomery County did a periodic review of exempt properties in the county. Upon review, it was determined that the apartment complex should not receive a tax exemption.[5] The Church received a letter on June 20, 2008, informing it of the decision, but without any explanation for why the exemption was being withdrawn, aside from the assertion that there were "no legal grounds" to support the exemption. The General Assembly had revised the language of the exemption when it created the Tax–Property Article in 1985, but the provision has continued to allow for a tax exemption for a parsonage or convent.[6]

---

**5.** The Supervisor of Assessments of Montgomery County is the named party in this action. We note, though, that the supervisors of each of Maryland's 24 subdivisions consult with an official at the State Department of Assessments and Taxation when considering an exemption. Except in routine matters, an official at the State Department of Assessments and Taxation makes a final decision on whether to grant an exemption, in part to ensure uniformity of decisions across Maryland. At the time of the 2008 letter to the Church rejecting its request for an exemption, John W. Brennan was the Supervisor of Assessments of Montgomery County. B. Marie Green, the named party in this action, currently holds that title.

**6.** In creating the Tax–Property Article, the revisors noted that § 7–204 was "derived without substantive change" from the earlier Article 81, § 9(a) and (c). Md.Code (1986), § 7–204. The previous wording of the exemption provision applied to property "actually used exclusively for public religious worship, including parsonages and convents ..." This wording at least *suggests* that, under that earlier version of the statute, a

*The current tax exemption dispute*

The Church appealed the decision to the Property Tax Assessment Appeals Board for Montgomery County, which affirmed the decision of the Supervisor of Assessments, again without explanation. The Church appealed the decision of the board to the Maryland Tax Court, which held a hearing on the matter on June 3, 2009. The Church offered testimony from three Church officials, including a former ordinance worker, who described the organization of the Church, elaborated on the duties of ordinance workers, and provided details about the apartment complex. Other Church officials testified about how the rents typically have not covered the operating costs of the apartment complex and the Church's view on what should constitute a parsonage and convent.

Robert Young, the Associate Director of the State Department of Assessments and Taxation,[7] testified on behalf of the Supervisor of Assessments. Young said that he consulted with the Supervisor of Assessments in deciding that the apartment complex was not entitled to a property tax exemption as either a parsonage or convent.

Young said that he used the ordinary dictionary definition of the word parsonage, as well as the description offered by the Court of Special Appeals in *East Coast Conference of the Evangelical Covenant Church of America, Inc. v. Supervisor of Assessments*, 40 Md.App. 213, 388 A.2d 177 (1978).[8] As for

---

parsonage or convent had to be used "exclusively for public religious worship." Regardless, the current version of the statute makes it plain that public religious worship is one of three uses of property owned by a religious group or organization that may qualify it for an exemption.

7. Young later was appointed the Director of the State Department of Assessments and Taxation.

8. In *East Coast Conference of the Evangelical Covenant Church of America, Inc. v. Supervisor of Assessments*, the intermediate appellate court set out a definition of parsonage as "a house supplied to a parish minister by the parish congregation or church." 40 Md.App. 213, 215–16, 388 A.2d 177 (1978). Young interpreted *East Coast Conference* as requiring that a minister who lives in the parsonage must have an identifiable, local congregation. In applying that definition, Young said

the definition of convent, Young sought guidance from a 1970 report of the Maryland Legislative Council Committee on Taxation and Fiscal Matters. The legislative intent as evidenced by that report was to allow an exemption for religious orders, including monasteries. Young interpreted that information as follows:

> And so based on that reading and based on the common ordinary dictionary meaning my definition of a convent or monastery is where a group of men or women take certain vows: Poverty, celibate chastity and obedience to a superior, an abbot or a prioress. And then they live in a convent building or they live in a monastery building.

Young stated he took additional support from a Tax Court case, *Life in Jesus, Inc. v. Supervisor of Assessments,* No. 06–MI–FR–0610 and Cross–Appeal No. 06–MI–FR–0621 (Md. Tax Court Dec. 31, 2008), in which the Tax Court affirmed a denial of a monastery exemption. Young noted that convents historically have housed groups of unmarried men or women who take lifelong vows of poverty, celibate chastity, and obedience, and live together in a communal lifestyle. He added that not all of these elements are required, as the office applies a "totality of the circumstances" approach in deciding whether to grant an exemption. Exemptions have been granted for Hindu and Buddhist monasteries or convents. Young acknowledged, however, that the office purposely does not maintain any published guidelines containing definitions of these terms and giving guidance to local assessors on how to apply the convent and parsonage property tax exemptions.

The Maryland Tax Court affirmed the decision of the Property Tax Assessment Appeals Board denying an exemption to the apartment complex. The Tax Court decided that the complex does not qualify as a parsonage or a convent under

---

he looked to the specific duties of a minister to determine if he or she is a church's main spiritual counselor and to the training the person received to be a minister. Young testified that the administrative practice of the department has been to require that a church supply the parsonage free of charge in order to qualify for the exemption.

▬▬▬▬▬▬▬▬

the "ordinary and usual meaning of the words in the statute." [9]
As to whether the apartment complex constituted a convent,
the court stated the following:

> In defining the common ordinary dictionary meaning for
> the term convent or monastery, this Court has employed a
> similar analysis as it did in defining a parsonage. The
> dictionary definitions of convent and monastery do not
> include married men and women and single persons living
> separate lives in separate households. Ordinance workers
> do not take vows of poverty, chastity and obedience to a
> superior as do[es] a typical monk or nun. Ordinance work-
> ers do not make lifetime commitments like nuns and monks
> and do not keep a common purse or share things in com-
> mon. Moreover, as is the case with supplying a house to a
> minister or supplying a place to live in a convent, nuns and
> ministers do not pay rent to the Church for a home in which
> to live.

The Tax Court concluded that the definitions of parsonage
and convent used by the Supervisor of Assessments did not
violate the Establishment Clause of the First Amendment to
the U.S. Constitution. The Tax Court found that the State was
not discriminating among religions, but rather applying a
neutral statute with a secular purpose in a manner that did
not advance or inhibit religious belief.

The Church filed a petition for judicial review by the Circuit
Court for Montgomery County, which held a hearing on the
matter on December 14, 2010. In an order issued August 31,
2011, the Circuit Court reversed the decision of the Tax Court
and ruled that the apartment complex qualified both as a
parsonage and a convent and should be granted a tax exemp-
tion.[10]

---

9. The Tax Court found that it was clear that an apartment complex
could not be a parsonage and the ordinance workers, although engaged
in performing church sacraments, did not qualify as ministers. More-
over, the Tax Court ruled that the multi-state area served by the Temple
did not meet the definition of a local, identifiable congregation, as
required under *East Coast Conference.*

10. As to the meaning of parsonage, the Circuit Court found that the Tax
Court erred in interpreting *East Coast Conference* as requiring that a

In ruling that the apartment complex qualified as a convent, the Circuit Court reasoned that the ordinance workers "live in a communal style" by worshiping together on Sundays, providing guidance to one another, studying scripture as a group, and working together in the Temple on a regular basis. The Circuit Court found that the Tax Court erred by defining members of a convent in terms of a "typical monk or nun," as this wording does not appear in the exemption statute. "The Ordinance Workers do take vows of marital chastity, they cannot work or earn income while providing services to the Temple, and they are devoted to a superior being," the Circuit Court observed. The fact that the ordinance workers live in separate apartments is not dispositive, as the Circuit Court noted that a Hindu church was given a property tax exemption for several single-family homes that were viewed as being a convent.

On the question of whether the statute violates the Establishment Clause, the Circuit Court ruled that "[t]he law could not constitutionally require that to qualify for an exemption a religious organization have an organizational structure exactly parallel to that found in other religions, denominations, or churches, Christian or otherwise." The Circuit Court observed that the Church has a different structure than other religions, and that certain rites may only be performed in the Temple and then only by ordinance workers. The ordinance workers are trained in their duties, serve "a discrete group who reside within that District," and live in housing furnished by the Church. The Circuit Court concluded that it could not be a requirement of the law that all religions must establish the same type of organizational structure in order to receive a tax benefit.

---

minister living in a parsonage have a "local" congregation, noting that *East Coast Conference* dealt with a minister who had no congregation in the area at all. The Circuit Court also faulted the Tax Court for concluding without any basis that the ordinance workers did not constitute ministers because they were lacking "in terms of their training, background, and responsibilities."

The Supervisor of Assessments noted an appeal to the Court of Special Appeals on September 23, 2011. This Court, on its own motion, granted a writ of certiorari in the case on June 21, 2012. *Green v. Church of Jesus Christ of Latter–Day Saints*, 427 Md. 62, 46 A.3d 404 (2012).

## II.

We analyze the decisions of the Tax Court in the same manner as other administrative agencies. *Frey v. Comptroller of the Treasury*, 422 Md. 111, 136, 29 A.3d 475 (2011). This means that we look through the decision of the Circuit Court and evaluate directly the conclusions reached by the Tax Court. *Id.* at 136–37, 29 A.3d 475. "[W]e may not uphold the final decision of an administrative agency on grounds other than the findings and reasons set forth by the agency." *Id.* at 137, 29 A.3d 475. Our review is "narrow," in that we do not "substitute our judgment for the expertise of those persons who constitute the administrative agency." *Id.* Instead, this Court applies the "substantial evidence" standard, in which "we consider whether a reasoning mind reasonably could have reached the factual conclusion the agency reached." *Id.* (quotation marks omitted) (quoting *State Ins. Comm'r v. Nat'l Bureau of Cas. Underwriters*, 248 Md. 292, 309, 236 A.2d 282 (1967)).

The parties here do not contest the factual findings, but the Church disagrees with the conclusions of law drawn by the Tax Court. The deference we accord to the agency's factual findings does not extend to the agency's purely legal conclusions. *Frey*, 422 Md. at 138, 29 A.3d 475. Rather, the resolution of legal issues is "uniquely within the ken of a reviewing court." *Id.; see Supervisor of Assessments v. Keeler*, 362 Md. 198, 208, 764 A.2d 821 (2001) (quoting *State Dep't of Assessments and Taxation v. Consumer Programs, Inc.*, 331 Md. 68, 72, 626 A.2d 360 (1993)) ("In short, a reviewing court is authorized to reverse a decision of the Tax Court, if the agency 'erroneously determines or erroneously applies the law.' "). With respect to an agency's conclusions of law, a

certain amount of deference may be afforded when the agency is interpreting or applying the statute that the agency itself administers. *Dep't of Human Resources v. Hayward,* 426 Md. 638, 650, 45 A.3d 224 (2012). Property tax exemptions certainly are within the purview of the Tax Court; yet "[w]e are under no constraint . . . to affirm an agency decision premised solely upon an erroneous conclusion of law." *Pro–Football, Inc. v. McCants,* 428 Md. 270, 283, 51 A.3d 586 (2012) (quoting *Thomas v. State Ret. & Pension Sys.,* 420 Md. 45, 54–55, 21 A.3d 1042 (2011) (internal quotation marks omitted)).

The present case involves the legal correctness of the Tax Court's construction of the words parsonage and convent as they are employed in § 7–204 ("Property that is owned by a religious group or organization is not subject to property tax if the property is actually used exclusively for: . . . (2) a parsonage or convent."). The parties dispute whether the Tax Court is owed any deference in its construction of those terms. The Supervisor of Assessments argues that we are presented with a mixed question of law and fact and, accordingly, the conclusions of the Tax Court should be given deference. The Church, in contrast, argues that the Tax Court misstated the law, by applying a "novel interpretation" of the words parsonage and convent. As to that legal error, the Church asserts, the Tax Court is owed no deference. We agree with the Church. The meaning of the words parsonage and convent is a matter of statutory construction and thus purely a legal question. *See Marsheck v. Bd. of Trs. of the Fire & Police Employees' Ret. Sys. of the City of Baltimore,* 358 Md. 393, 402, 749 A.2d 774 (2000) (noting that the meaning of the word "injury" in a retirement benefits statute is "a solely legal issue").

We are aware of, but find inapplicable here, the rule of statutory construction by which "[w]e give deference to a consistent and long-standing construction given a statute by an agency charged with administering it." *Stachowski v. Sysco Food Servs. of Baltimore, Inc.,* 402 Md. 506, 517, 937 A.2d 195 (2007) (citing *Marriott Employees Fed. Credit Union*

*v. Motor Vehicle Admin.*, 346 Md. 437, 445, 697 A.2d 455 (1997)). *See also Hope v. Baltimore County*, 288 Md. 656, 662, 421 A.2d 576 (1980) (noting that "an administrative practice which has been followed by officials of the State for a long period of time has a very persuasive influence on the judicial construction of the statute"). Factors to be considered in determining the weight to be given to the Tax Court's interpretation include "the duration and consistency of the administrative practice, the degree to which the agency's construction was made known to the public . . . [and] the extent to which the agency engaged in a process of reasoned elaboration in formulating its interpretation and the nature of the process through which the agency arrived at its interpretation." *Stachowski*, 402 Md. at 517, 937 A.2d 195 (internal quotation marks omitted) (quoting *Marriott*, 346 Md. at 446, 697 A.2d 455). When, however, the record does not reveal much, if anything, about the administrative practice of an agency, then this principle is not applicable. *See Montgomery County v. Deibler*, 423 Md. 54, 62–63 n. 2, 31 A.3d 191 (2011) (stating that a single workers' compensation commission order and conflicting trends in commission cases do not provide a strong enough record on which to apply the principle).

■ As to the interpretation of the word convent, there does not appear to be a record of a long-standing practice in the Tax Court of construing the term. Furthermore, the record does not suggest that the Tax Court, in construing convent as it did, relied on a long-standing practice of that court to employ such a construction. Instead, the Tax Court appeared to rely on case law and dictionary definitions of the word in order to ascertain the meaning of it and, only then, applied that meaning to decide, ultimately, that the Church's property at issue was not a convent.[11] Under these circum-

---

11. Prior to issuing its ruling, the Tax Court heard the testimony of Young, the associate director of the State Department of Assessments and Taxation. Young testified that there are no published guidelines or written directions to assist tax assessors in interpreting § 7–204. The ultimate determination of whether to grant an exemption is based on the judgment of Young, who said he conferred with the Supervisor of

stances, we owe no deference to the Tax Court's construction of this term.

 Instead, we make an independent determination of the meaning of the statutory language at issue. In doing so, we rely on the often-cited rules of statutory interpretation to construe the meaning of convent as the word is employed in § 7–204. "A court's primary goal in interpreting statutory language is to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by the statutory provision under scrutiny." *Gardner v. State*, 420 Md. 1, 8, 20 A.3d 801 (2011) (quoting *State v. Johnson*, 415 Md. 413, 421, 2 A.3d 368 (2010)). When the words of a statute are ambiguous, we attempt to resolve that ambiguity "by searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process." *Gardner*, 420 Md. at 9, 20 A.3d 801 (quoting *Johnson*, 415 Md. at 422, 2 A.3d 368). "In every case, the statute must be given a reasonable interpretation, not one that is absurd, illogical or incompatible with common sense." *Id.* As we apply those rules of construction to the present case, we remain mindful that "if any real doubt exists as to the propriety of [a tax] exemption that doubt must be resolved in favor of the State." *Keeler*, 362 Md. at 209, 764 A.2d 821 (quoting *Chesapeake and Potomac Telephone Co. of*

---

Assessments of Montgomery County in reaching a decision in the present case. In making his determination about the meaning of convent, Young consulted the 1970 report of the Maryland Legislative Council Committee on Taxation and Fiscal Matters, reviewed a decision of the Maryland Tax Court, and used common dictionary definitions in order to reach what he termed "my definition."

Young testified that he was previously unaware of the apartment complex or the tax exemption it had received because the exemption was granted before Young joined the State Department of Assessments and Taxation. Young stated that his definition of convent has been applied in a "consistent" manner since late 1980, when he joined the department. Other than Young's testimony, however, there is nothing in the record presented to or relied upon by the Tax Court indicating that the Tax Court had a long-standing practice of employing the same definition as the one employed by Young.

*Maryland v. Comptroller of the Treasury,* 317 Md. 3, 11, 561 A.2d 1034 (1989)).

### III.

The parties offer starkly different interpretations of both parsonage and convent, as those terms are employed in § 7–204. We, however, need not decide what is meant by the word parsonage because, as we shall see, the property at issue qualifies as a convent for purposes of § 7–204. Again, that section, "Religious groups or organizations," provides in its entirety:

> Property that is owned by a religious group or organization is not subject to property tax if the property is actually used exclusively for:
>
> (1) public religious worship;
>
> (2) a parsonage or convent; or
>
> (3) educational purposes.

We concur with the parties, the Tax Court, and the Circuit Court that neither the plain language of § 7–204 nor the statutory scheme within which it fits sheds much light on the meaning of the word convent. The word is not defined in either § 7–204 or elsewhere in the statute. The parties do not point to, and our research has not disclosed, any legislative history that suggests a meaning for the word convent at the time of the 1972 adoption of the tax exemption or as part of the 1985 creation of the Tax–Property Article. All that is apparent from the statute is that a property asserted to be a convent must be affiliated with a "religious group or organization" and not be used exclusively for public religious worship or educational purposes, because those uses are listed separately as reasons for granting an exemption. This narrows the meaning of the term but offers little by way of affirmative guidance.

The 1970 report of the Maryland Legislative Council Committee on Taxation and Fiscal Matters sheds some light on the thinking of lawmakers at the time the exemption was creat-

ed.[12] The report notes that the exemption is designed to benefit "religious orders," including atheistic organizations, and cites two cases from this Court as part of efforts to construe the exemption. The report views this Court as holding in *Morning Cheer, Inc. v. Board of County Comm'rs,* 194 Md. 441, 71 A.2d 255 (1950), that "[a]ny property actually used for religious purposes is exempt." Additionally, the report summarizes this Court's holding in *Murray v. Comptroller of the Treasury,* 241 Md. 383, 216 A.2d 897 (1966), as being that the property of an atheistic group is entitled to a tax exemption. The Supervisor of Assessments, citing *Supervisor of Assessments v. Trustees of Bosley Methodist Church Graveyard,* 293 Md. 208, 217–218, 443 A.2d 91 (1982), argues that the General Assembly's intention in revamping the state's property tax exemptions was to narrow the range of exempt property in order to prevent the state's tax base from eroding. We stated in *Bosley* that courts "are not at liberty to broaden the application of tax exemptions to include property not specifically enumerated in a tax exemption statute." 293 Md. at 218, 443 A.2d 91.

There is, though, a difference between expanding a property tax exemption to include property that was not intended by the General Assembly to be covered, and properly construing the words of an exemption to ensure that all property entitled to an exemption receives one. It is to this latter end that we look to the dictionary definitions of convent offered by both parties, as well as the definitions used by our sister courts, in an attempt to set forth a standard that can be applied to future cases. *See Deibler,* 423 Md. at 67, 31 A.3d 191 (citation

---

**12.** Parsonages, but not convents, were a part of the Maryland Code at the time of the 1970 report. The language of the applicable statute at that time exempted the following property:

(4) *Churches, parsonages, etc.*—Houses and buildings used exclusively for public worship, and the furniture contained therein, and any parsonage used in connection therewith, and the grounds appurtenant to such houses, buildings and parsonages and necessary for the respective uses thereof.

Maryland Code (1957, 1969 Repl.Vol.), Article 81, § 9(4).

omitted) (noting that a dictionary definition can be a "useful starting point" for interpreting the words of a statute).

The Supervisor of Assessments cites five dictionary definitions, all taken from various editions of Webster's dictionaries, some of which are also cited in support by the Church.[13] In addition, the Church offers a definition from another edition of Webster's and from a 1910 edition of Black's Law Dictionary.[14]

---

**13.** The Supervisor of Assessments cites the following dictionary definitions for convent and monastery:

Webster's New World Dictionary of the American Language—Second College Ed. (1976):

*Convent:* 1. A community of nuns or, sometimes, monks, living under strict religious vows. 2. The building or buildings occupied by such a group.

*Monastery:* 1. A place of residence occupied by a group of people, esp. monks, who have retired from the world under religious vows. 2. Those living in such a place.

Webster's New Collegiate Dictionary (1977):

*Convent:* A local community or house of a religious order or congregation; esp: an establishment of nuns.

*Monastery:* A house for persons under religious vows; esp: an establishment for monks.

Webster's Ninth New Collegiate Dictionary (1985):

*Convent:* A local community or house of a religious order or congregation; esp: an establishment of nuns.

*Monastery:* A house for persons under religious vows; esp: an establishment for monks.

Webster's II New Riverside University Dictionary (1988):

*Convent:* 1. A community, esp. of nuns, bound by vows to a religious life under a superior. 2. The building or buildings occupied by a convent.

*Monastery:* 1. The dwelling place of a community of religious persons, esp. friars. 2. The community of friars residing in a monastery.

Webster's II New College Dictionary—Third Ed. (2005):

*Convent:* 1. A community, esp. of nuns, bound by vows to a religious life under a superior. 2. The building or buildings occupied by a convent.

*Monastery:* 1. The dwelling place of a community of religious persons, esp. friars. 2. The community of friars residing in a monastery.

The Church in its brief cites with approval the latter two definitions found in Webster's II New Riverside University Dictionary (1988) and Webster's II New College Dictionary—Third Ed. (2005).

**14.** The Church cites the following two additional definitions:

Merriam Webster's Collegiate Dictionary (10th ed.1993):

*Convent:* A local community or house of a religious order or congregation.

The Church also cites cases from outside of Maryland where courts have applied various definitions of convent.[15] Because many of these definitions use the terms nun and monk, we must consider definitions of these terms, as well.[16]

Although we construe strictly the language of property tax exemptions, we have generally taken a common-sense approach when it comes to religious exemptions, in order to achieve a fair construction of the statute. *See Maryland State Fair and Agric. Society, Inc. v. Supervisor of Assessments,* 225 Md. 574, 588, 172 A.2d 132 (1961) (noting that "tax-exemption statutes are to be strictly construed, but a strict construction permits a fair one, so as to effectuate the legislative intent and objectives"). For instance, in *Keeler* this Court held that 16.5 open acres of land owned by a church, that could not be developed for any purpose, could qualify under the church's exemption for public religious worship. 362 Md. at 222, 764 A.2d 821. In deciding that it could, this Court noted that the focus is on whether land was "being put to uses other than the charitable, educational, or religious use which gave rise to the exemption." *Id.* at 216–17, 764 A.2d 821. The

---

*Monastery:* A house for persons under religious vows.
Black's Law Dictionary (2d ed.1910):
 *Convent:* A religious house.

**15.** *See Ass'n for Educ. Dev. v. Hayward,* 533 S.W.2d 579, 584 (Mo.1976) ("a community of persons devoted to religious life under a superior"); *Diocese of Cent. New York v. Schwarzer,* 23 Misc.2d 515, 519, 199 N.Y.S.2d 939 (N.Y.Sup.Ct.1960) ("an abode for persons devoted to a particular religious life"), *aff'd,* 13 A.D.2d 863, 217 N.Y.S.2d 567 (1961). The Church acknowledges that other courts have interpreted the word convent in a manner that would arguably not include the apartment complex because of a requirement that the religious workers be in seclusion. *See Missionaries of Our Lady of La Salette v. Village of Whitefish Bay,* 267 Wis. 609, 66 N.W.2d 627, 632 (1954) ("a place where men or women bound by vows in a religious organization live a community life in seclusion or retirement upon the premises").

**16.** The Church cites Merriam Webster's Collegiate Dictionary (10th ed.1993) for the definitions of monk ("a man who is in a member of a religious order and lives in a monastery") and nun ("a woman belonging to a religious order"). The Church acknowledges, however, that within the longer definition of nun is a description of a person who is "under solemn vows of poverty, chastity, and obedience."

acres surrounding the church "provide[d] a natural setting for the church and, thus, the religious worship use." *Id.* at 222, 764 A.2d 821. Technically speaking, the unused portion of the land surrounding the church was not devoted exclusively to religious worship. But this Court took a common-sense approach in determining that a fair reading of the statute permitted an exemption, particularly when the land was not being used for any other purpose and was a part of the overall parcel.

Similarly, in *Morning Cheer* this Court approved an exemption for a Bible study retreat that was used for ten weeks during each summer for daily religious services, prayer meetings, and Bible study. 194 Md. at 444, 447, 71 A.2d 255. We recognized that the use was "different from that of an ordinary church and parsonage," and we allowed for an exemption for about 35 acres of cleared land that housed various buildings associated with the retreat because they were necessary for public worship. *Id.* at 447, 71 A.2d 255. The retreat did not operate as a typical place of public worship and remained empty for most of the year, but we looked to the "primary objects" for which the property was used to reach our conclusion. *Id.* at 446, 71 A.2d 255.[17]

---

17. We also have examined a case of the Tax Court that Young cited as being helpful in interpreting the meaning of the word convent. *See Life in Jesus, Inc. v. Supervisor of Assessments,* No. 06–MI–FR–0610 and Cross–Appeal No. 06–MI–FR–0621 (Md. Tax Court Dec. 31, 2008). Young testified that the case concerned a group of married couples who lived in separate houses, but frequently shared meals and held group Bible study sessions together. According to Young, their religious faith allowed for married nuns and priests. The couples sought, but were denied, a tax exemption as a convent and the Tax Court affirmed the denial, Young stated. There may have been testimony during the hearing before the Tax Court relevant to the case *sub judice,* but the final order of the Tax Court does not shed any light on its interpretation of the word convent. The only mention of convent is in reference to a "convent of nuns" living on the property, and the Tax Court's observation that other portions of the property in question did not fall under the parsonage or convent exemption. There is no explanation for why portions of the property did not qualify as a convent, or what definition of convent the Tax Court applied in reaching its decision.

We bear in mind this common-sense approach to statutory construction as we consider the definition of convent used by the Tax Court in denying an exemption to the Church. The Tax Court stated that the definitions of convent and monastery "do not include married men and women and single persons living separate lives in separate households." Additionally, the Tax Court required "vows of poverty, chastity and obedience to a superior" in the vein of "a typical monk or nun." Furthermore, the Tax Court ruled that convent members must "make lifetime commitments like nuns and monks" and "keep a common purse or share things in common." Those living in a convent "do not pay rent to the Church for a home in which to live."

Reviewing the definitions offered by the parties, we find that the Tax Court's definition of what constitutes a convent is too narrow and should not be the exclusive interpretation of that term. There are two main qualities shared by most of the definitions: a convent is (1) a community of people who are (2) bound by strict religious vows. The general secondary meaning of convent is the building where a community of people bound by these vows lives together. Marital status is not a part of these definitions. Nor are specific vows of poverty, chastity, and obedience. The words monk and nun are frequently used in describing convents and monasteries, but there is no indication of what qualities a "typical" monk or nun must possess. The definitions also do not mention lifetime commitments, common purses, or paying rent to a church.

We agree with the Church that the Tax Court's interpretation accords only with certain religious traditions and is more closely aligned with, for instance, Roman Catholic or Anglican traditions. We are mindful of the dangers in adopting a definition that adheres too closely to the doctrine of a single religion.[18] But we are also aware that convent may be defined

---

**18.** *See Presiding Bishop of the Church of Jesus Christ of Latter–Day Saints v. Ada County,* 123 Idaho 410, 849 P.2d 83, 98 (1993) (Johnson, J., dissenting) ("Will only those 'traditional' religious organizations that

in various ways and simply to disapprove of a definition offers little guidance to future tax assessors, boards of appeal, and courts on how to proceed.

■ Distilling the various definitions offered by the parties and researched by this Court, we have concluded that there are several basic qualities a convent must contain in order to be eligible for a tax exemption: A convent consists of a community of people who live together, follow strict religious vows, and devote themselves full-time to religious work. This definition does not expand impermissibly the scope of the property tax exemption, and it avoids an unduly narrow reading of the statute.

■ In light of our decision as to what constitutes a convent, we conclude that the Tax Court applied an incorrect legal standard in determining whether the apartment complex qualified as a convent for purposes of § 7–204.[19] The facts are not in dispute, and, based on the record as developed by the parties, the apartment complex qualifies as a convent by application of the definition set forth in this opinion. The ordinance workers qualify as a "community of people who live together." Although the workers inhabit separate units within the apartment complex, they live together at one location, socialize, and worship together as a group every Sunday. In addition, the ordinance workers "follow strict religious vows" and are removed from their positions working in the Temple if they forsake them. Finally, the ordinance workers "devote themselves full-time to religious work," as they spend their days each week during their two-year commitment performing religious ceremonies within the Temple, and they hold no outside employment.

---

have a traditional 'parsonage' be entitled to the statutory exemption? If so, the result will be to 'establish' these religious organizations as favored by the state....").

**19.** As noted earlier, because we hold that the apartment complex is a convent, it is unnecessary for us to decide in this case whether the Tax Court erred in its interpretation of the word parsonage.

We therefore direct a remand to the Tax Court for it to apply the definition of convent we describe today and issue an order granting a property tax exemption to the Church for the apartment complex. *See O'Donnell v. Bassler,* 289 Md. 501, 509, 425 A.2d 1003 (1981) (noting that "if an administrative function remains to be performed after a reviewing court has determined that an administrative agency has made an error of law, the court ordinarily may not modify the agency order" and instead "should remand the matter to the administrative agency").

**JUDGMENT OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY AFFIRMED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REMAND THE CASE TO THE TAX COURT FOR FURTHER PROCEED-INGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLANT.**